## BURWELL *against* JACKSON.

### JACKSON *against* BURWELL, cross suit.

In every contract for the sale of lands there is an implied warranty on the part of the vendor that he has a good title to that which he assumes to sell, unless such warranty is expressly excluded by the terms of the contract.

Such implied warranty exists so long as the contract remains executory; and it is only upon the execution of the contract by a deed or conveyance that the law throws upon the purchaser the responsibility of caring for his own protection by suitable express covenants.

A covenant, therefore, by the vendors, that they would execute to the purchaser on a certain day " *a good and sufficient deed of conveyance* " of a certain lot of land, was held to bind the vendors to *convey a good title* to the purchaser; and the title of the vendors having been extinguished before conveyance by sale under a mortgage, although the mortgage existed and was upon record at the time of making the contract, it was *Held*, that the purchaser had a right to treat the contract as rescinded, without demanding a conveyance;

'and that this failure of the vendors' title was a good defence to an action brought to enforce payment of a judgment obtained upon a note given in part payment of the first instalment of the purchase money; such judgment having been rendered before the extinguishment of the vendors' title by the sale under the mortgage, and consequently at a time when the purchaser had no valid defence.

ON the 1st day of June, 1835, an agreement was made, under the hands and seals of the respective parties, between James D. Bemis, Pierre A. Barker, John W. Clark and Roswell W. Haskins of the first part, and Arenton J. Douglass of the second part, by which the said Bemis and his associates agreed that, on the performance by said Douglass of the covenants on his part, they would " execute, or cause to be made and executed, unto the said party of the second part, or his legal representative or representatives, *on the first day of June*, 1836, *a good and sufficient deed of conveyance* of a certain lot of land in the city of Buffalo," describing it.

Douglass, the party of the second part, covenanted and agreed as follows: " to pay for said lot of land the sum of two thousand five hundred dollars, in ten equal annual payments, with annual interest on the whole sum; the first instalment and the interest which shall then have accrued to be paid on the first day of June, 1836, at which time, and on delivery of the deed aforesaid, a bond and mortgage for the remaining purchase money shall be executed by the party of the second part, or his legal representative or representatives, payable as above stipulated." The agreement also contained a provision that in case of non-performance by Douglass of any of the covenants on his part, Bemis and his associates might reënter, and that all the rights of Douglass under the agreement should thereupon cease.

The lot described in the agreement was part of a large tract of land then owned by the parties of the first part in the city of Buffalo, which tract was subject at the date of the agreement to several mortgages covering the whole or separate portions thereof; and among others to a mortgage

for $20,000, given by the said Pierre A. Barker to Mark H. Sibley for the purchase money of a portion of the said tract. These mortgages were all on record in Erie county in June, 1835, when the agreement was made.

Prior to June, 1836, the defendant in the original suit, Amansel D. Jackson, purchased the interest of Douglass in the agreement for the sum of $1000, and took an assignment from Douglass with the consent of Bemis and his associates. On the 8th day of June, 1836, Jackson paid the sum of $133 in cash upon the contract, and gave his note for $292, which was accepted in full of the first instalment, due June 1, 1836. On the 18th of July, 1836, the four proprietors, Bemis and others, executed and acknowled ed a deed of the lot described in the agreement, and also prepared a bond and mortgage to be executed by Jackson, and left both the deed and the bond and mortgage in the hands of their clerk, where they remained, nothing further having been done in regard to them; and nothing more was ever paid or offered to be paid by Jackson upon the contract.

By some arrangement between the four proprietors, the note of Jackson for $292 became the property of John W. Clark, who brought an action in his own name, and in May, 1838, recovered a judgment for the amount of the note.

In April, 1838, the four proprietors made a partition among themselves of the whole tract, by which the lot in question was assigned, together with other parcels, in seve- ralty to the said Pierre A. Barker, it being provided by the deed of partition that the portion so assigned in severalty to the said Barker should be subject to the said mortgage from him to Mark H. Sibley. The contract with Douglass was also assigned to Barker by the partition deed.

An execution was duly issued upon the judgment against Jackson, to the sheriff of Erie county, where he resided, and returned *nulla bona*.

In December, 1839, the judgment was assigned to the plaintiff Burwell for the consideration expressed in the

assignment of one dollar, which was the only evidence of any payment by Burwell.

In 1846, the mortgage from Barker to Sibley was fore-closed by the assignee of Sibley, and the premises, including the lot in question, were sold under a decree of the court of chancery, and conveyed by the master to Walter Joy, the purchaser at the sale.

In May, 1847, the plaintiff Burwell filed a creditor's bill, being the bill in the original suit, to enforce the collection of the judgment on the note, containing the usual allegations; and in November, 1849, he also sued out an attachment against Jackson under the provisions of art. 1, tit. 1, chap. 5, part 2 of the Revised Statutes, for the purpose of collecting the same judgment, upon which the property of Jackson was seized by the sheriff; and in order to secure a discharge of the property, a bond was executed with sureties, pursuant to the statute, upon which bond a suit was commenced by the plaintiff Burwell, to which the defendants therein pleaded, and which is still pending.

Three of the original proprietors of the said tract of land, to wit, Barker, Clark and Haskins, became insolvent as early as 1839 or 1840. The fourth, Bemis, has always been and still continues solvent.

Jackson put in an answer to the original bill, setting up as a defence, among other things, the foregoing facts, with the exception of those relating to the suing out of the attachment; and subsequently filed a cross bill alleging the same facts, and also the fact of the issuing and execution of the attachment, and the subsequent proceedings thereupon, and praying for a perpetual injunction against the collection of the judgment.

The original and cross suit were referred to a sole referee to hear and decide, who sustained the bill in the original suit, and directed the appointment of a receiver, and an assignment by the defendant in the usual form in that suit, and a dismissal of the bill in the cross suit.

The supreme court in the eighth district confirmed the report and gave judgment for the plaintiff in the original suit, and for the defendant in the cross suit.

From this judgment the defendant in the original suit and plaintiff in the cross suit appealed to this court.

The cause was submitted here upon printed arguments by

*Greene & Sheldon* for the appellant.

*T. Burwell* for the respondent.

SELDEN, J., delivered the opinion of the court.
This case will be rendered comparatively simple, by considering, first, what would be the rights of the parties, in case the original vendors had retained their interest in the note, and had themselves obtained the judgment, and filed the creditor's bill and sued out the attachment in their own names; because if the defendant in the original suit would have had no defence as against them, he can have none as against the plaintiff Burwell. On the other hand, if we arrive at the conclusion that the defence set up would be good, if the note had been sued and the creditor's bill filed in the names of the four original proprietors of the lot in question, we have then only to see what there is in the case to give to the plaintiff Burwell any other or greater rights than the vendors themselves would have had.

Viewing the case in this light, it becomes indispensable in the outset to put a construction upon the main covenant contained in the original agreement on the part of the vendors. It can never be known which party is in default, until their mutual obligations are ascertained. The vendors agreed that on the performance by the purchaser of the covenant on his part, they would "execute or cause to be made and executed unto the said party of the second part, or his legal representative or representatives, on the first day of June, 1836, a good and sufficient deed of convey-

Burwell *against* Jackson.

ance of a certain lot of land," &c. Is this covenant satisfied by the execution of a deed good in point of form merely? or does it require such a deed as will convey a good title to the land sold? If those obvious principles of natural justice, which the law applies to analogous cases, are to be applied to this, it would seem that the question here presented ought not to admit of serious doubt. Upon every sale of a chattel, the law implies a warranty on the part of the vendor that he is the owner of the property and has a right to convey, although nothing whatever is said on the subject. This is not an arbitrary or accidental rule, but one which rests upon a solid foundation of reason and justice. It is fair and just to presume that a vendor knows the nature and extent of his own rights. The vendee has not the same means of knowledge. To require a vendor, therefore, to make good the title to that which he assumes to sell, is simply requiring him to guaranty that he is not committing a fraud. It is a principle universally recognized, by all civilized codes, that whenever a thing sold has some latent defect, known to the seller, but not to the purchaser, the former is liable for this defect, unless he discloses his knowledge on the subject to the latter before the completion of the sale. The doctrine of implied warranty of title rests upon the same principle. The only difference is, that in case of a defect in title, knowledge by the vendor *is presumed*; but when the defect is in quality merely, the common law requires it to be proved. It is obvious that the reason upon which this doctrine is based applies no less to sales of real than of personal estate. Moral writers and writers upon natural law make no distinction between the two cases. ( *Cicero de Off.*, 3, 13; *Grotius de Jure, &c.*, 1, 2, *ch.* 12, § 9.) Neither does the civil law. (1 *Domat, pt.* 1, *book* 1, *tit.* 2, § 10, *art.* 6, *et seq.*; *Poth. on Contracts of Sale*, §§ 82, 87, *et seq.*) I think, too, that the common law, notwithstanding the many subtle distinctions and modifications of the rule which it has adopted, will be found to have

Burwell *against* Jackson.

adhered substantially to this acknowledged principle of right. Some of its earliest rules are based upon it. Originally, the customary words of conveyance in a deed amounted to a warranty; as the word *dedi* in a feoffment, or *concessi* in a grant for years. (*Co. Lit.*, 384, *a.*) This doctrine had its foundation in the principle of implied warranty of title. The words *demise* and *grant*, in a lease, are still held to import a covenant for quiet enjoyment. (*Grannis* v. *Clark*, 8 *Cow.*, 36.) But the same rule has not been applied to the operative words ordinarily used in the more modern forms of conveyance; and since the case of *Frost* v. *Raymond* (2 *Caines*, 188), it has been regarded as settled, in this state, that neither the words *grant, bargain, sell, alien* or *confirm,* when used in a *conveyance* of real estate, import a warranty. We have a statute, also, which provides that " no covenant shall be implied in any conveyance of real estate." (1 *R. S.*, 738, § 140.) The practice has now become universal, both in England and in this country, for purchasers to protect themselves by procuring the insertion of express covenants in their deeds of conveyance; and it is found to be most consonant to justice to apply the maxim *caveat emptor* to such cases, and to require the purchaser to look to his express covenants alone.

But neither this rule, nor the reason upon which it is founded, applies to *executory agreements* to sell and convey lands *in futuro*. In respect to such agreements, the principles upon which the doctrine of implied warranty rests are still applied, as well in England as in this country, with all their force. It has been repeatedly held in England that a purchaser is never bound to accept a defective title, unless he expressly stipulates to take such title knowing its defects; and these decisions have been made without any regard to the particular language of the agreement to purchase. They rest upon the principle of implied warranty of title, and can have no other basis. (*White* v. *Foljambe*, 11 *Vesey*, 337; *Deverell* v. *Lord Bolton*, 18 *Vesey*, 508; *Waring* v. *Mackreth,* *Forrest*, 129.) It seems never to have been doubted that

this was the rule in case of a sale of a freehold, nor of a leasehold so far as the right of the vendor to the lease itself was concerned; but it was for a long time a disputed question in England, whether upon a sale of a mere leasehold interest the vendor was bound to show not only that he owned the lease, and had authority to sell it, but that the original lessor had power to create the term. This question was finally settled by the court of exchequer in 1821, in the case of *Purvis* v. *Rayer* (9 *Price*, 488). In that case it was held, after great deliberation, that if a contract be made for the sale of leasehold property unconditionally, and without a stipulation *in terms* on the part of the vendor that he meant to sell his interest only, and that he would not warrant the lessor's title, he is bound to show the right of the original lessor to grant the lease. The Lord Chief Baron in this case rests his decision upon the general principle that every vendor, whether of lands or of goods, impliedly warrants his title to be good to what he sells; the only question being whether that rule in case of a sale of a mere leasehold interest extended to the title of the landlord. He says: "The principle applies to everything; and there seems to me to be no sound reason why leaseholds should be an exception. If an estate of inheritance be sold, *it is admitted on all hands* that the vendor must produce his title; and why then is a purchaser bound to take a lease for a term of years, in equity or honesty, although after he has paid the purchase money it may not last an hour?"

But it may be said that this last case as well as those previously cited arose in equity, and that it may well be that a court of equity would not enforce a specific performance, while at law the purchaser would be bound. There is, however, no doubt that the rule at law is the same as in equity. The case of *Doe* v. *Stanion* (1 *Mees. & Wels.*, 695) was an action at law. The purchaser in that case was the tenant of the vendor. The agreement to purchase was in the following terms: "1831, September 2d.

Samuel Stanion purchased an estate in the parish of Corbey, bought of Robert Gray, at the sum of £100. Received on account, 10s. Mr. Robert Gray is willing to let the sum lie by paying 4 per cent." This agreement·was signed by the parties, and ten shillings deposit paid. It was held that there was an implied warranty of title in that case. PARKE, B., in giving his opinion says: "Is, then, the contract in question a contract of ·this conditional nature ; to purchase for £100, provided a good title should be made and the estate transferred? We conceive that there is no doubt but that it is to· be· so construéd ; for in the first place,⁹ in, contracts for the sale of real estate, an agreement to make a good title *is always implied,* of which the case of *Souter* v. *Drake* (5 *Barn. & Adol.,* 992) is a strong instance." The case here referred to by Baron PARKE was an action at law to recover the price agreed to be paid for a leasehold estate. The agreement on the part of the plaintiff was simply to assign the lease and deliver up possession, and this he offered to do. But the defendant refused to pay because the plaintiff did not show a good title in the original lessor. The court held the defendant right in refusing. Chief Justice DENMAN says: " For the reasons above given, we come to the conclusion that, unless there be a stipulation to the contrary, there is in every contract for the sale of a lease an *implied undertaking* to make out the lessor's title to demise, as well as that of the vendor to the lease itself, which implied undertaking is available at law as well as in equity."

These cases seem never to have· been disputed. They are referred to and recognized in the latest editions of *Sugden's Law of Vendors* as sound expositions of the law. ( *Sug. on Vendors,* ch. 1, § 3, art. 17, *Amer. ed.* ) It is clear, therefore, that in·England there is in every executory contract for the sale of lands, whatever may be the language in which the agreement is couched,. an implied undertaking to make a good title, unless such an obligation is expressly excluded by the terms of the agreement. In this state also the deci-

sions have generally been in accordance with this principle of the common law. (*Seymour* v. *De Lancey*, 6 *John. Ch. R.*, 222; 3 *Cow.*, 445, *S. C.*; *Everson* v. *Kirtland*, 4 *Paige*, 628; *Clute* v. *Robinson*, 2 *John.*, 595; *Judson* v. *Wass*, 11 *John.*, 525; *Van Eps* v. *The Corporation of Schenectady*, 12 *John.*, 442.) The cases, however, of *Gazley* v. *Price* (16 *John.*, 267) and *Parker* v. *Parmele* (20 *John.*, 130) are exceptions. In the first of these cases the covenant was to " give the defendant a good and sufficient deed for the premises," and the court held that this covenant was performed by the execution of a deed sufficient in point of form to convey whatever title the vendor might have. In the other case the plaintiff had covenanted to execute to the defendant a "good warrantee deed of conveyance of the premises," and it was decided that he was not bound to convey a good title, but all that the covenant required was that he should execute a proper deed containing a covenant of warranty. In *Fletcher* v. *Button* (4 *Comst.*, 396), Judge RUGGLES reviewed all these cases; and although it did not become necessary in that case to pass definitely upon the principles adopted in *Gazley* v. *Price* and *Parker* v. *Parmele*, yet the learned judge clearly intimates that in his opinion those cases could not be reconciled either with the previous decisions or with sound reason. In reference to the case of *Parker* v. *Parmele* he says : " But the reasoning in that case falls short of showing that a covenant to execute a good and sufficient deed of conveyance is satisfied by a deed of conveyance which *conveys* nothing." If the words of such a covenant were to be construed simply according to their grammatical import, without reference to the nature of the contract in which they occur, it might lead to the conclusion arrived at in *Parker* v. *Parmele*. But the authorities to which I have referred show conclusively that whatever may be the language of a vendor in a contract for the sale of lands, the law implies an undertaking that he has, and will convey, a good title. In the case of *Souter* v.

Burwell *against* Jackson.

*Drake* (*supra*) the vendor *in terms* only agreed that he would *assign the lease and deliver possession.* He offered to do both; but the court held that he must show in addition to this that the landlord had a good title.

All the cases on this subject, which have been properly decided, have been, like this case, based not upon a grammatical or literal interpretation of the language of the covenant, but upon the doctrine of implied warranty applicable to all cases of sale; in respect to which the rule is the same, as I have abundantly shown, in equity and at law. I have no hesitation, therefore, in holding that, under a covenant, like, that in this case, to execute "a good and sufficient deed of conveyance" of lands, a vendor has a right, if he discover the title to be defective, to refuse to receive it, and this right is not affected by the fact that the defect might have been discovered, at the time of entering into the agreement to purchase, by an examination of the public records. Executory agreements for the purchase of lands are frequently made under circumstances which afford neither time nor opportunity for a thorough examination, and the purchaser cannot be presumed, prior to entering into such an agreement, to have investigated the title. But aside from this, a vendee can never be bound, as between him and the vendor, to search the records for defects of title. The protection of vendors from the consequences of agreeing to sell that which they do not own constitutes no part of the object of the recording acts; nor is it any answer to a warranty, either express or implied, that the purchaser might by inquiry have ascertained it to be false. The reason why the implied warranty on the part of the vendor ceases, upon the consummation of the contract of sale by the execution of a deed, is not that the vendee is presumed to have investigated the title and discovered the defects, if any there be, but that it is reasonable to require the vendee, in taking a deed, which is a more solemn and deliberate act than entering into a preliminary agreement for the purchase, to protect himself by an

express warranty agreeably to common usage. The defendant, therefore, was not bound to take a title to the lot, subject to the incumbrances upon it, notwithstanding those incumbrances were on record.

What then, in view of these principles, were the respective rights and duties of the parties under their agreement? The defendant Jackson, upon making as he did the first payment, had a right to require the execution of a deed by the vendors. But in order to put them in default for not executing it, it was incumbent on him to demand its execution. So on the other hand the vendee could not be put in default for not executing the bond and mortgage until the vendors had made and tendered their deed. Neither party ever made any such demand or tender. It is clear, therefore, that at the time when the second instalment became due neither party could rescind, because neither had a right to treat the other party as having failed in the performance of his contract. They stood upon an equal footing, and the contract continued obligatory upon both. Did the non-payment of the second and subsequent instalments, then, put the vendee or his assigns in default? Upon the doctrine of some of the cases, this question should be answered in the affirmative. But the case of *Grant* v. *Johnson* (1 *Seld.*, 247) has settled the principle that covenants like those in this case are dependent, and that the execution of the deed is a condition precedent to the payment of the instalments subsequent to the first. The vendee or his assigns, therefore, were never put in default in this case.

The consequence of this conclusion is, that his right to demand the execution of a deed upon payment of the arrearages continued up to the time of the sale upon the Sibley mortgage. This sale and the conveyance under it put it out of the power of the vendors to convey any title to the purchaser. This, of course, under the construction of the covenant which we have adopted, authorized the assignee of the vendee to treat the contract as rescinded, unless it should

be held that he was bound still to demand a deed. I consider it settled, however, that no such demand was necessary. The rule on this subject was laid down at an early day in *Sir Anthony Main's case* (5 *Coke*, 21), and seems to have been generally adhered to since. In that case, Sir Anthony had given a bond to his tenant to make a new lease at any time upon the surrender of the old one. Being sued upon the bond, he pleaded that the tenant had not surrendered, to which the latter replied that he, Main, had conveyed away the reversion, and on demurrer the replication was held good. It is said by COWEN, J., in *Harrington* v. *Higgins* (17 *Wend.*, 376), that this case was never questioned, and he cites a number of cases in which the same principle was adopted. The case of *Harrington* v. *Higgins* itself does not conflict with this rule, because the covenants in that case were held to be independent, and because the defendant was guilty of the first default. I think it may be assumed, therefore, that the law is, that where the title of a vendor who has contracted to convey is totally destroyed, the vendee is not bound either to offer to perform on his own part or to require performance by his vendor, but may at once treat the contract as rescinded.

It follows from this, that upon the sale and conveyance under the foreclosure of the Sibley mortgage, the defendant Jackson had an immediate cause of action against the vendors to recover back the money paid, and of course that he had a good defence as against them to any legal proceedings to enforce the collection of the note given for the balance of the first instalment. They could have no just right to collect money which they would be instantly bound to refund to the party from whom it was received. No court, and especially no court of equity, would countenance any such claim. It is not a case where the defendant is concluded by the judgment, because the defence did not exist until long after the judgment was recovered. No defence existed until the sale under the Sibley mortgage. Until that event

occurred the vendee had no right to rescind the contract. The vendors had not been put in default by a demand for a conveyance of the lot; and it would have been sufficient for them if they were able to make a good title when required to convey, which, until the sale, they might have done by paying off the mortgage. This conclusion renders it unnecessary to notice any of the other points made by the counsel.

It remains only to inquire whether there is anything in the case, to give to the plaintiff Burwell any greater rights than the original vendors themselves would have had. The transfer of the note to Clark and the recovery of judgment by him could not of course change his relations to the maker of the note as one of the original vendors. The same obligations which rested upon them jointly, rested also upon him individually. It is very doubtful therefore, if Burwell were a *bona fide* purchaser for a consideration paid, whether this would give him any greater rights than Clark the plaintiff himself had. Possibly, however, as the defence did not exist at the time of the assignment, it might. But it does not appear that he was such a purchaser. The assignment expressed a nominal consideration merely, of one dollar, and there was no proof that anything was paid. In the case of *Jackson* v. *Cadwell* (1 *Cow.*, 622), it was held that it was not sufficient for a party claiming to be a *bona fide* purchaser, to show a conveyance expressing a consideration, but he must go further and show the consideration actually paid. I think this a just rule. But I do not understand it to be claimed in this case that Burwell was a *bona fide* purchaser. On the contrary, the case states that he had become *trustee* for Clark, and I infer that he held this judgment in his character of trustee and not in his own right.

This, under the views already taken, is decisive of the case. The judgment of the supreme court must be reversed, and the bill in the original suit dismissed. The prayer of the cross bill for a perpetual injunction should be granted,

and the proceedings remitted to the supreme court with instructions to carry into effect this judgment.

Ordered accordingly.