Allen, J.
We agree with the referee that the plaintiff has shown that the defendant was not able to give to her, at the proper time, such a title as was required by the obligation of the contract, and that she, therefore, had the right to rescind and recover her deposit.
The reasons given by the referee for his decision, in his careful opinion upon that branch of the case, are satisfac *398 tory to us, and lead us to affirm the judgment on that ground.
Judgment affirmed, with costs.
The opinion of the referee is as follows:
Brown, A. C.
(Referee) On the 35th day of March, 1885, the defendant,' who, under an assignment for the benefit of its creditors by the firm of Paulding, Kemble <& Co., and by the members of the firm individually, had succeeded to the title of James N. Paulding to the premises 56 Marion street and 91 Crosby street, in the city of New York, being the lots of land abutting on each other and running through from Marion street to Crosby street, sold the lots at public auction. By the terms of sale it was provided, among other things, that the purchaser should pay ten per cent of the purchase price and the auctioneer’s fee of twenty dollars per lot, immediately on the sale; that the balance of the purchase money should be paid on April 15, 1885, at twelve o’clock noon at the office of the defendant’s attorney, when and where the deed would be ready for delivery, and that the premises were sold subject to taxes and encumbrances, existing mortgages to be paid out of the purchase money as far as possible. Then followed the statement- “ Incumbrances on the property are about as follows: Mortgage to secure $7,000, held by George G. De Witt, Jr., and Jacob K. Lockman, trustees, etc., of Sarah Taiman, deceased, due September 8, 1873, continued on sixty days’ mutual notice.
“ Mortgage to secure $7,500, held by Ellen Kemble. These mortgages cover both properties. They are to be paid off out of the purchase money if sufficient. The assignee believes that all taxes and assessments on the property have been paid. Leased until May 1, 1885.'”
Mr. John Hayes, an attorney at law, on behalf of his sister, the plaintiff, who owned other property on Marion street, attended the sale and bid off both lots at $26,100; signed the usual memorandum of sale at the foot of the terms of sale, and out of the plaintiff’s moneys paid to the defendant the ten per cent and auctioneer’s fees, amounting together to $2,650. Ator soon after the sale, Mr. Hayes disclosed his principal to the defendant’s attorney, and requested that the deed run to her. Soon after the sale Mr. Hayes applied to another attorney for a loan of about $13,000, and at the inception of such examination of the title as he made, a lis pendens was discovered on file apparently affecting the property. Further investigation developed the fact that the lis pendens was filed in a suit brought in the late court of chancery, the bill in which was filed July 21, 1836. The suit was brought by John McGeer and Thomas McGeer and by Peter McGeer and Mary Ann McGeer, alleged to be infants, by John McGeer, their next friend, as heirs at law of one Arthur McGeer, against the children and devisees of one Peter Kemble, to enforce the performance of an agreement alleged to have been made in the year 1819, by Peter Kemble with Arthur McGeer, whereby Kemble was to sell to McGeer the lots in question for the sum of $1,200, and under which McGeer had entered into possession, paid a portion of the purchase money and made improvements and remained in possession until his death in 1825. The bill, among other things, further alleged the death of Kemble in 1823; the probate of his will, the expulsion after their father’s death of the complainants by the defendants from the property, the then possession of the premises by the defendants, or some of them, a deed of the premises in 1824 from the other defendants to the defendant Mary Kemble; knowlege in the defendants of the agreement of 1819; ignorance of complainants as to their rights, and a demand and refusal to perform. An answer and replication were also on file, as well as some other papers showing that proofs had been taken, but nothing appeared on the files to show that anything had been done in the suit after 1844.
In consequence of the discovery of this apparent cloud on the title, the closing of the sale to the plaintiff was adjourned by consent to April 20, then to the 23d, then to May 2, then to May 15, and then to May 16, and on the latter day, but before the hour appointed for the meeting, Mr. Hayes called on defendant’s attorneys and informed them that he declined to take the title, and on the same day the .plaintiff began this action to recover the ten per cent and auctioneer’s fees. The complaint also asks for $175, expense of searching title, but that claim was abandoned on the trial.
*399 There is some dispute as to precisely what occurred between Mr. Hayes and defendant’s attorney before May 16 with reference to the effect of this chancery suit on the title, and what could be done to get rid of any possible effect, but it is agreed that Mr. Hayes expressed the opinion that the suit was a cloud which could not be effectually removed in the manner proposed by defendants’ attorneys, and that, at most, defendants’ attorneys offered to make an effort to get the lis pendens canceled and the suit discontinued. The attorney to whom Mr. Hayes had applied for a loan seems to have taken the same view as Mr. Hayes, as he declined to make the loan. It is in proof that prior to the sale Mr. Hayes knew nothing of the existence of the chancery suit, and that though the defendant knew of it and that its existence had prevented the closing of a sale of the property made some years previous, he did not disclose those facts to Mr. Hayes or other bidders at the sale, his reason for making no such disclosure being, as he states, that his counsel had advised him, after discussing the subject, that “there was no reason why he should not go on and offer the property for sale.” On the last day and hour agreed upon for closing the sale, a deed proper in form and satisfaction pieces of the mortgages were ready at the office of defendants’ attorneys for delivery to Mr. Hayes, but, as before stated, he did not attend, having in the morning of that day declined to take the title. t that time the Us pendens was still on file and the chancery suit still pending.
On the eleventh day of June following, defendants’ attorneys, having been substituted in the chancery suit for two of the defendants, presented a petition to the supreme court, entitled in the chancery suit, and verified by said two defendants, the defendant in this action and James N. Paulding, the grantee of Mary Kemble, one of said two defendants, setting out the facts in regard to the existence of said chancery suit and that no proceedings had been had in it since 1844; that all of the defendants except the two joining in the petition were dead; that in 1870 James H. Paulding and his attorney had caused diligent inquiry and search to be made for the plaintiffs McGeer or their descendants, but they were unable to find further trace of them than that when last heard of one of the brothers ¡McGeer was reported to be connected with river thieves, and the sister to have been put in a poor-house or asylum, and that all of them were supposed by those who had known them to have been dead for many years past;” that defendant Nourse “had recently caused further diligent search to be made for them, or any of them, but that his efforts have been entirely unsuccessful.” That in a partition of the real estate of Peter Kemble in 1844, the other heirs had joined in a deed of the premises in question to the petitioner, Mary Kemble (now Parrott); that iñ 1854 Mary Kemble and husband conveyed to the petitioner, James 2ST. Paulding; that in 1860 Charles O’Conor admitted to said Paulding’s attorney that he had not seen nor heard of the complainants for many years; that said O’Conor was dead; that said Paulding had assigned to Hourse; that Nourse had contracted to sell to Hayes and Hayes objected to the title because of the cloud which he claimed existed by reason of the Us pendens and the pendency of the suit, and prayed that the Us pendens be canceled; the bill dismissed as to the two defendants; the suit declared abated as to the other petitioners, and that on such notice as the court should direct, the suit should abate as to all persons unless continued by the proper parties within a time to be specified.
On this petition and an affidavit giving the name of a late partner of Mr.. O’Conor, and that of one of his executors, an order was made requiring the complainants or their representatives to show cause on June 17th why the relief prayed for in the petition should not be granted, and directing that the same be served on said partner and said executor “as the only persons on whom it was possible under the circumstances to serve notice of the application.”
On June 17th no one appearing to oppose except the executor, an order was made adjudging the service of the order to show cause on the former partner and the executor of Mr. O’Conor to be sufficient notice and the only possible notice which the circumstances presented on the application allowed; canceling the Us pendens of record; dismissing the bill as to the petitioners, and directing that the suit wholly abate unless on or before December 31, 1885, it be continued by the proper parties, the petitioners to publish a notice of the order, addressed to whom it might concern, once a week for four weeks in the *400 months of July, October and December, 1885, in the “Register” and “ Hew York Times "
On or about June 25th defendants’ attorneys inclosed to Mr. Hayes a copy of this last order, and notified him that the Us pendens was canceled on the 17th, and that on the 29th a deed would be ready for him at their office.
In October, 1885, the defendant sold the two lots separately to other parties, whose attorneys accepted the title as it then stood, but one attorney, as it appears, of a party to whom one of the purchasers applied for a loan, objected to the title, and the loan was refused.
On May 1, 1886, on an affidavit showing publication of notice as directed in the order of June 17th, 1885, and that no one had continued the suit, an order was made that the suit wholly abate.
Upon this state of facts the question is presented, can the plaintiff in this action recover from the defendant the ten per cent and the auctioneer’s fees paid by her to him.
Although the terms of sale provided that the purchaser should take subject to all incumbrances, counsel for the defendant in the trial stated that he did not claim that the plaintiff was bound to take subject to any incumbrances other than the taxes and mortgages mentioned, and we can therefore consider the rights and obligations of the parties as if no such clause existed.
Upon principle as well as authority, it cannot be doubted that the plaintiff was entitled to receive from the defendant a “ good title ” to the premises purchased, and that in default of receiving or being tendered such title, she had the right to rescind and sue for the money paid. Burwell v. Jackson, (9 N. Y., 535, 541); Leggett v. Mutual Life Insurance Co., 53 N. Y., 394, 398; Cockcroft v. Muller, (71 N. Y., 367). What a “good title,” such as a purchaser is entitled to, is may be gathered from the adjudged cases. Thus, in Burwell v. Jackson, (supra), page 545, it is said “ a vendee has a right, if he discovers the title to be defective, to refuse to receive it,” In Judson v. Wass, (11 Johns., 525, 527), such a title is called an “ indefeasible ” title. In Rigney v. Coles (6 Bosw., 479, 485, it is called “ a good marketable title.” In Earl v. Campbell (14 How. Pr., 330, 332), “ a perfect title.” In Jordan v. Poillon (77 N. Y., 518, 521), a title which is not doubtful, or one exposing the purchaser to the hazard of a contest with other parties. In Schriver v. Schriver (86 N. Y., 575, 584), one not open to judicial doubt, " a marketable ” one, and in Fleming v. Burnham (100 N. Y., 1, 8, “a marketable title, free'from reasonable doubt.”
I am aware that most of these definitions are taken from actions or proceedings to compel specific performance of contracts for the purchase of lands, and that it is claimed that in such cases, a “good title” is a different thing from a “ good title " in an action at law for damages on rescission. I confess myself unable to subscribe to this doctrine, if it is meant to be asserted that the rights of the parties to a contract are different when looked at from a legal and an equitable standpoint. I can well understand how a court of equity, in the exercise of a sound discretion, and for reasons which cannot be urged in a court of law, may relieve parties from the performance of contracts, but I do not understand that the exercise of this power proceeds upon any other or different construction of the legal rights of the parties under the contract than is recognized in courts of law, and it will be observed that in all the cases above cited when defining “a good title,” the court is speaking of the rights of the purchasers under the contracts. It must be conceded, however, that in the case of O'Reilly v. King (2 Robt., 587), followed in the same court in two cases reported in (52 Supr., 321), and (24 Weekly Dig., 327), a divided court did hold that in an action at law proof of a doubtful title merely is not sufficient, and the prevailing opinion states that there is a difference in this respect between actions at law and suits in equity. The proposition advanced is not sustained by any reasoning, and but one authority is referred to, and that an English one (6 Taunt., 263), decided in 1815. An examination of that authority shows that, although in a remark by one of the judges on the argument, the proposition is perhaps suggested, no reference is made to it in the final decision, and in the later English cases the proposition seems to be disapproved. Thus in Jeakes v. White (6 Excheq. Rep., 873), which was an action at law to recover a deposit paid under a contract of sale, the court says: “A good title was to be understood as such a title as a court of chancery would adopt as sufficient ground for complete specific performance, ” and in Simmons v. *401 Haseltine (5 Jurist N. S., 270), a similar action at law, it was said: "A title dependent on a question of fact which it is impossible to consider reasonably certain is not a good title.” I think, too, that the superior court cases are inconsistent with what ought to be controlling decisions in our own state, for to say nothing of implications contained in some of the more recent decisions of our court of appeals from which the above definitions are taken, in the case of Burwell v. Jackson (supra), after stating on page 540, that: “To require a vendor to make good the title to that which he assumes to sell, is simply requiring him to guarantee that he is not committing a fraud.” Judge Selden says, at page 542: “ But it may be said that this last case as well as those previously cited, arose in equity and that it may well be that a court of equity would not enforce a specific performance, while at law the purchaser would be bound. There is, however, no doubt that the rule at law is the same as in equity.”
Assuming, then, that the plaintiff under her contract was entitled to a good, indefeasible, marketable title, free from reasonable doubt, was the title tendered on the sixteenth of May such a title? I think not. The chancery suit was pending and the Us pendens was on file, and the plaintiff, through her agent, had notice of both facts. A month had elapsed since the title was objected to, but no steps had been taken to remove the objection so far as plaintiff’s agents knew or were informed. True, nothing was done in the suit for many years, but the suit had not abated.
There is no such thing, so far as I know, as abatement of a suit by presumption of law from lapse of time. Even if all the complainants were, in fact dead, which does not appear, the cause of action alleged in the bill was such as would survive, and who could say that there was no one in existence who could assert it. It may very well be that if at any time since 1844 the original complainants had appeared and sought to prosecute the suit, the court would have denied their motion for leave to continue it against the representatatives of the deceased defendants, on the ground of their laches, but it does not by any means follow that it certainly would, much less that it would deny a similar motion made by complainant’s successors in interest, if any, presenting excuses for not having appeared before. It appeared by the bill that two of the complainants were infants. The bill stated a good cause of action, and, if sustained, the title in the heirs of Kemble and their grantees, all of whom had notice of the suit by reas-.n of the Us pendens, would be defeated. The plaintiff was not called on to try the issues in that suit, and take the chances of the correctness of her judgment, or that of any one else, as to the validity of the claim asserted. Any decision of those issues “ would not be controlling upon the parties who were not represented,” and the plaintiff would be “left to the hazard of a contest with other paities.” Jordan v. Poillon, supra, 521, 522; Fleming v. Burnham, supra, 10. Had the chancery suit been of recent origin, no one can doubt that plaintiff’s objection would have been perfectly valid, and I cannot think that it was any the less valid because the suit was of long standing, so long as there was a reasonable doubt—as there certainly was—whether the complainants, or any of them survived, or whether there was any successor in interest in existence who could come in and continue the suit.” See Schriver v. Schriver, supra, 583. In the case of Jeakes v. White, above referred to, the fact which was not considered “reasonably certain” was the non-existence of certain heirs, and the proofs of their non-existence were quite as strong as the proofs of the non-existence of persons interested •as plaintiffs in this chancery suit. No one, I think, can say, on the facts as they then existed, and as they were known to exist by the plaintiff’s agent, that his objection was of the class mentioned in Fleming v. Burnham, supra, as insufficient, namely, ”merely captious, or “a mere suggestion of defects which no reasonable man would consider, although within the range of possibility,” or one which is “ clearly invalid by the law as settled.”
If I am right in the conclusion that this Us pendens and chancery suit were, on May sixteenth, a valid objection to the title, then as to plaintiff, who through her agent had notice, it wouid seem to be clear that the subsequent proceedings, for the cancellation of the lis pendens and the abatement of suit, were of no effect. They were taken on notice to no one interested, and as to the lis pendens, not even on notice to the general public, and this notwith *402 standing the fact- that it has heen held that the court cannot cancel a lis pendens so long as the suit is pending and undetermined See Mills v. Bliss v. 55 N. Y., 139. They did not bind any parties to the suit or their representatives, who were not before the court actually or constructively, and whatever may be their effect, if any, as to subsequent purchasers, they would furnish no protection to the plaintiff. But if these proceedings did cure the defects, as to everybody, that result was not reached until the order of Hay 1st,. 1886. was entered, and that was after the sale of the property to other parties, and. so of course after defendant had put it out of his power to convey to plaintiff. The canceling of the lis pendens in June, 1886, was of no consequence to-plaintiff so long as she knew that a suit of that character was still pending. It did not cancel notice in her. Six months had to elapse before the suit could be ended, and in my judgment she was under no obligations to .wait eight months for her deed when defendant had stipulated to give it to her within less: than one month of the sale.
If, however, I am entirely in error as to the effect of the chancery suit upon the title, there is another ground upon which I think the plaintiff is justified in disaffirming the contract, and entitled to recover the money paid. .
It cannot be denied that the existence of the chancery suit was a circumstance of at least some importance as bearing upon the questions of title and value. On account of it one previous sale had fallen through. The defendant deemed it of sufficient moment to consult his counsel about it prior to the: sale at which Hr. Hayes bought. At least two attorneys thought it presented so serious a question that they refused to make loans on the property, and defendant’s attorneys admitted the pendency of the suit and its importance by taking steps to have it abated. And yet, with full knowledge of the suit and that it had already defeated one sale, the defendant concealed these facts and offered the premises at auction without a word to put any one on inquiry. He went even further, and by enumerating certain incumbrances impliedly declared that there were no others. Judson v. Wass, supra, p. 528 Mr. Hayes at that time knew nothing of the suit. He bid on the assumption that there were no undisclosed defects, and paid and the defendant received a consideration regulated in view of this implied condition. Fleming v. Burnham, supra, p. 8. As said in Burwell v. Jackson (supra), “It is a principle universally recognized by all civilized codes, that whenever a thing sold has some latent defect, known to th.e seller, but not to the purchaser, the former is liable for this defect unless he discloses his knowledge on the subject to the latter before completion of the sale.” The duty incumbent on the defendant in this respect was concededly not performed, and' its non-performance, coupled with the recitals of incumbrances above alluded to, amounted in law to a fraud on the purchaser, for which he had the right to rescind. Pomeroy's Eq. Juris., vol. 2, § 901. To escape this dilemma the defendant claims in substance that he was advised by counsel that the existence of the.suit was no cloud on the title, and that he was not bound to disclose the facts at the sale. Advice of counsel honestly given and faithfully followed may protect the client from criminal prosecution, but it is no further protection when the rights of parties are involved (45 N. Y., 654; 7 Paige, 364; 1 Duer, 512; and 9 N. Y, 263; 19 Hun, 327. 2 Eds. Ch., 628); and in Hawley v. Bennett (4 Paige Ch., 164), the chan cellor remarked: ■' The rights of parties must be protected against the wrongful acts of the adverse party, although he may have acted under the advice of counsel.” I do not mean to imply that in suppressing the facts the defendant was guilty of any intentional wrong, or that his counsel did not act in entire good faith; all I mean to say being that the withholding of the knowledge he possessed was, as matter of law, a fraud upon the purchaser, which, at his option, avoided the sale. See King v. Knapp (59 N. Y., 462, 467, 468).
In view of the fact that the plaintiff asks to recover only the money; paid by her to the defendant, had I any doubt of her right to recover as a strict question of law, I should, upon the facts presented, and in view of the liberal provisions of our Code and the decisions under it, be inclined to grant her the relief, although the complaint is in form one in an action at law. All that is needful in a complaint under our present system of pleading is, “ to state facts sufficient to show that the plaintiff is entitled to the relief demanded, and it is the duty of the court to afford the relief without stopping to speculate upon the name to *403 be given to the action.” Wright v. Wright, 54 N. Y., 437, 443; and see Murtha v. Curley, 90 N. Y., 372.
My conclusion is that that the plaintiff is entitled to judgment for $2,650, with interest from March 25, 1885, and the costs of the action.