FRED LOCKWOOD v. F. M. GEIER and Others.[1]

June 15, 1906. October 26, 1906.

Nos. 14,762—(83[2], 4[3]).

**Reformation of Contract.**

In reforming a contract, equity looks at the substance and not at the form of transactions, and gives effect, not to the mere words which the parties may have used, but to their actual intentions, and enforces the agreement which the parties had really made, not that which they had not made, but seemed to have made.

**Mutual Mistake.**

The evidence in this case is examined, and *held* not to show a mutual mistake in a contract to sell land with respect to the form of conveyance or the right of one party to elect to declare the contract void on failure of title.

**Cancellation of Contract.**

When a party to a contract brings an action to cancel it on the ground that another has refused to perform it, he must stand on the contract as he executed it, and is not in position to assert that the contract has failed because the other party did not literally comply with the requirements of the contract as to the deposit in escrow of the first instalment of the consideration.

**Findings—Evidence.**

*Held* that the controlling findings of fact made by the trial court are sustained by the evidence, and that they support its conclusion of law that the contract of the parties as to the sale of land be reformed, and as reformed that it be canceled.

[1]Reported in 108 N. W. 877; 109 N. W. 245.
[2]April, 1906, term.                    [3]October, 1906, term.

Action in the district court for Big Stone county to reform a con-- tract for the sale of land and to cancel the contract so reformed. The case was tried before Flaherty, J., who found in favor of plaintiff. From an order denying a motion for a new trial, defendants appealed.. Affirmed on rehearing.

*Young & McElligott,* for appellants.

*Aaron B. Kaercher, Lyndon A. Smith,* and *L. W. Collins,* for respondent.

JAGGARD, J.

Plaintiff and respondent, as the vendor in a contract for the sale of land, brought this action to reform a contract and to declare it canceled or to rescind it. The answer of defendants and appellants, the vendees, sought specific performance as to all the land except a particular quarter (as to which the title was claimed to have failed) upon the payment of the contract price, less a proportionate deduction. In the preliminary oral negotiations which resulted in the contract, the controverted details of which will be presently considered, the plaintiff offered to convey an eight hundred acre farm and a threshing machine to the defendants for $21,450. To embody the agreement then made, a scrivener drew two contracts, one in regard to the machine and threshing, and another concerning the land. The machine was delivered to the defendants and was sold by them for $1,000, the sum which they agreed to pay for it. The written agreements as to the land required that the conveyance be by deed of special warranty. The land contract contained this clause:

> It is also agreed that the first payment of $5,000 and this con- tract shall be deposited in the bank of Ortonville, and be there held until said first party shall have completed the necessary proceedings so as to be able to convey full and perfect title to said land, and should he be unable to convey such title said money shall be returned and this contract canceled at the election of said second parties.

The threshing contract contained this clause:

> It is agreed that if the title to the land included in said contract of sale is not finally accepted by said Geiers [defendants],.

and the sale not completed, said [defendants] shall pay me [the plaintiff] the sum of $1,000 in addition to doing my threshing.

Plaintiff claims that three things were stated by him to the scrivener and agreed to by defendants: (1) That the form of conveyance must be by quitclaim deed; (2) that the defendants must make their own investigation of title; and (3) that if they were not satisfied with the title, the deal should be ended. He insists that he knew nothing about, the actual provisions of the contract inconsistent with this view of the agreement. That contract and defendants' checks to pay the first instalment of the purchase price remained in the possession of the bank. The title to one quarter section turned out to be defective, in this: that it stood in the name of the plaintiff's insane wife. The defendants "wouldn't take it without they got a good deed to that quarter." When the title was refused, as the plaintiff insisted and defendants denied, plaintiff began an action against defendants for $1,000 which he claimed became due by virtue of the contract as to the threshing machine. Until the litigation of that claim, he had supposed that the defendants had abandoned their contract. When he found out to the contrary, the suit upon the threshing contract was dismissed and this action commenced.

The plaintiff in this proceeding sought to reform the contract by striking out the words "special warranty" wherever they appear, and by inserting in lieu thereof the word "quitclaim," and by striking out of said contract the words "at the election of said second parties." No fraud is alleged. The relief as to reformation rests exclusively upon allegations of mutual mistake. Defendants by their answer denied the alleged mutual mistake, alleged that the land contract as drawn correctly reproduced the preliminary oral agreement of the parties, admitted the failure of the title to one particular quarter, alleged compliance by them in all respects with the terms of the contract, and prayed for specific performance, as above stated.

1. It may well be doubted whether or not the relief sought in this case was based upon a mutual mistake of fact, as to which, in appropriate cases, relief will be granted, or upon a mistake of law, with respect to which, in a constantly narrowing circle, relief will be refused. For the purposes of this case only, it may be conceded that this rule of

law applies, namely: Where parties, in reducing an agreement to writing, fail by mutual mistake to embody their intention in the instrument, either because they do not understand the meaning of the words used or their legal effect, equity will grant relief by reforming the instrument, and it matters not whether such mistake be called one of fact or of law. See Wall v. Meilke, 89 Minn. 232, 94 N. W. 688; Benson v. Markoe, 37 Minn. 30, 33 N. W. 38, 5 Am. St. 816; Kyle v. Fehley, 81 Wis. 67, 51 N. W. 257, 29 Am. St. 866. But see Haviland v. Willets, 141 N. Y. 35, 35 N. E. 958; Lane v. Holmes, 55 Minn. 379, 57 N. W. 132, 43 Am. St. 508.

The question then to be determined is whether or not the trial court was justified by the evidence in this case in finding that there had been a mutual mistake. The plaintiff has come into a court of equity and is subject to the principles of jurisprudence administered by such a tribunal. One of its elementary rules is that, 'in reforming a contract, a chancellor looks at the substance and not at the form of transactions, and gives effect, not to the mere words which the parties may have used, but to their actual intention. Equity undertakes to determine and enforce the agreement which the parties had really made, not that which they had not made, but seemed to have made. Therefore, for example, a court of equity may hold a conveyance in form a deed to be in effect a mortgage, and an absolute transfer to be a conveyance in trust.

The controversy in this case, then, turns upon what the parties actually intended, understood, and agreed. The entire record demonstrates, in substantially the plaintiff's own words, that the plaintiff offered to sell the land for what he would receive if he owned the title and agreed to convey title to the defendants. "Q. And a complete title? A. Why, yes." He put the land on the market as if it was his land and he owned it. This was not a case in which he offered to sell to the defendants any doubtful title, and to sell it cheap on that account. He was selling the land for a good market price. All parties supposed that the title to all the land stood in his name, and that he had title to it, save and except only his wife's interest in the nature of dower. He agreed to, and did in fact, commence and complete proceedings in court to bar her rights in the property, so as to enable him to convey perfect title without her signature. It was "because of the necessity of tak-

ing steps in [plaintiff's] behalf that the provision was inserted in the contract requiring it to be deposited in the Bank of Ortonville, in escrow, until these proceedings were finished." Plaintiff refused to give a general warranty deed, and insisted that defendants must make their own examination of title. He would not "stand for" any other question in the title except his wife's dower interest. To the equal surprise of all parties, that particular forty acres referred to did not stand in his name; but he had, some twenty years before, conveyed that land to his wife through a third party. Plaintiff paid taxes on this, his wife's, land. By the contract he agreed to deliver possession of all the lands to the defendants, who were to remain in possession until default. He testified that he leased the lands from the defendants in the fall of 1902, for the year 1903, under an oral agreement. In point of fact no change of possession took place; the contract having been delivered in escrow.

It is unmistakably clear, upon the plaintiff's own testimony, that the legal effect of the understanding between the parties was that the title to all the land was in the husband, that plaintiff would by statutory proceedings eliminate the interest of his insane wife in the nature of dower, and that he would not warrant anything anterior to the title in him. It is entirely clear that he undertook to convey to the defendants such a title as a married man has in lands owned by him. He is in effect estopped from asserting that he agreed to transfer, or that the defendants agreed to accept, title to land standing in his wife's name, in which his only interest was a contingent one in the nature of curtesy. This appears from the direct testimony of the parties, part of which has been previously referred to, and is consistent with the universal experience that a land buyer would not agree to pay some $25 an acre for land in which the grantor has no interest, except as the husband of his insane wife. In this view it is immaterial and unnecessary to discuss the relative legal import of a transfer by quitclam deed, by special warranty deed, or by a general warranty deed.

2. The evidence does not show that the words giving the defendants the right of election were inserted in the land contract by mutual mistake. The actual clause as to election was placed in the contract at the request of defendants by the scrivener when he drew the contract in the plaintiff's presence. The testimony does not show that either the de-

fendants or the scrivener was mistaken. Conceding that the writing did not express in this regard what the plaintiff intended that it should, a case of mutual mistake is not made out. That the clause giving the defendants the exclusive right of election appeared in the land contract, but not also in the threshing contract, is not conclusive for or against the plaintiff. The only contingency upon which the plaintiff could base an understanding of mutual right of repudiation as to the land contract was a failure of the title in some respect anterior to the instrument through which plaintiff acquired title. It is certain that neither party contemplated the contingency that the title to this particular quarter section should prove to be in the name of plaintiff's wife. Indeed, if the plaintiff did so know, then he made fraudulent misrepresentations of the title, and is in no position to seek equitable relief based on his own wrong. Whichever horn of the dilemma the plaintiff may take, he cannot prevail in equity.

3. It thus appears that the defendants received the threshing machine and sold it, and that in point of fact the plaintiff has never been actually paid any money. He insists that the defendants forfeited all their rights by the failure to make payments in accordance with the previously quoted provisions in the contract to deposit $5,000 in the bank. At one time the defendants arranged with the cashier of that bank to cash their checks for that amount, and finally deposited a cashier's check for that sum for that purpose. No objection was made by the plaintiff to this attempted compliance with the contract until after this suit was brought. However, the contract cannot be canceled on this ground after the reformation here sought until the defendants have been given an opportunity to perform. Indeed, this very action to reform the contract necessarily assumes that it was valid and subsisting. When a party to a contract brings an action to cancel it on the ground that another has refused to perform it, he must stand on the contract as he executed it. Quimby v. Shearer, 56 Minn. 534, 58 N. W. 155. It is not material, however, whether this aspect of the case be regarded as involving a waiver of literal performance of the deposit of cash and the acceptance of substituted performance, or a ratification of the contract in all respects, except as to the form of conveyance, and the mutual right of repudiation involved in this proceeding. Plaintiff has not shown himself entitled to relief on this ground.

It follows that the plaintiff is not entitled to the reformation, cancellation, or rescission. The trial court was therefore in error. It is impossible in this proceeding for this court to give the defendants further relief. Upon the findings of the trial court defendants are entitled to no relief. This court cannot completely change these findings of fact to conform with its views herein expressed.

The order of the trial court is therefore reversed, and a new trial granted.

On October 26, 1906, the following opinions were filed:

START, C. J.

The plaintiff's petition for reargument called our attention to the fact that the sufficiency of the evidence to support certain controlling findings of fact was not challenged by any assignments of error. For this reason, and to afford counsel an opportunity for a fuller analysis and discussion of the record, we ordered a reargument.

When the case was called for such rehearing, the defendants made a motion to amend their assignments of error so as to raise the question of the sufficiency of the evidence to support such findings. The question as to the proposed amendment was taken under advisement, and the reargument of the cause, by consent of counsel, proceeded upon the assumption that the question of the sufficiency of the evidence was properly raised. We have acted upon such assumption in reaching a conclusion on the merits of the case, and no formal order as to the motion is necessary. A further consideration of the record upon reargument has satisfied us that all of the findings of fact which are essential to support the conclusion of law of the trial court are supported by the evidence.

The complaint herein alleged, in effect, that the parties hereto on July 10, 1902, entered into an oral agreement whereby the plaintiff, in consideration of $21,450, agreed to convey to the defendants, without warranty, such title as he had to the 800 acres of land described in the complaint; that, if the plaintiff could not by proper proceedings in a reasonable time convey a good title to the land, the contract should be canceled and considered null and void; that the plaintiff then in good faith believed that he was the owner of the whole eight hundred acres, and that the only obstacle to his conveying the same was the fact that

his wife was, and had been for ten years, hopelessly insane, but he expected to procure a judicial decree enabling him to convey the land without his wife joining in the deed; that by the mutual mistake of the parties and the scrivener in reducing the oral contract of the parties to a written one, which they executed, a provision was inserted therein that the conveyance should be a special warranty deed, instead of a quitclaim deed, as the parties had agreed, and further that by such mutual mistake there was inserted therein the words "at the election of the said second parties" (the defendants) immediately following, and as a qualification of the provision in the written contract to the effect that, if the plaintiff should be unable to convey full and perfect title to the land, the money to be deposited as a part of the purchase price should be returned and the contract canceled; that after the written contract was executed, and on November 29, 1902, the plaintiff discovered for the first time that the title to one hundred sixty acres of the land was in the name of his wife, and that at the time of making the contract she was, and had been for many years, the owner thereof; that she died intestate, leaving him and their three children as her heirs at law; that the plaintiff cannot, and never has been able to, convey full and perfect title to the land or any title to the one hundred sixty acres except his interest therein as the surviving husband of his deceased wife; and, further, that plaintiff never received anything under the contract. The complaint contains other allegations which are not material on this appeal.

The defendants by their answer denied each allegation of the complaint not expressly admitted, and by way of cross-complaint alleged that there was no mistake made in reducing the contract to writing; that the defendants have been at all times ready and willing to comply with its terms on their part. They admitted that the plaintiff was not the owner of the one hundred sixty acres, and by implication that he could not convey good title thereto, for the answer alleged that they desired a fulfilment of the contract as to the residue of the land as to which the plaintiff had good title, and as to it they ask a decree for specific performance, with a deduction from the total purchase price in the sum of $7,500, "to which they are entitled by reason of the inability and failure of said plaintiff to convey the whole amount of the land covered by the contract."

The trial court found, with other facts, to the effect that the parties mutually agreed that the form of conveyance of the land should be a quitclaim deed, and that a deposit of $5,000 of the purchase price should be made in a designated bank and there remain until the plaintiff should be able to convey full and perfect title to the land, and, if he was unable so to do within a reasonable time, the money should be returned to the defendants and the contract between them should be canceled; that the contract as reduced to writing contained the terms and conditions of the actual agreement of the parties, except that it provided that the conveyance should be made by special warranty deed, instead of by quitclaim deed, and except, further, that there were added to the agreement of the parties that if the plaintiff could not convey full and perfect title to the land the contract should be canceled, the words of limitation "at the election of said second parties," which words were neither in language nor in substance a part of the agreement of the parties; and, further, that such words were added by the inadvertence of the scrivener without the direction of either party to the contract, and by the mutual mistake of each of them. As a conclusion of law the trial court directed a reformation of the written contract by eliminating therefrom the words "at the election of the said second parties," and that as so reformed it be canceled. And also that the contract be reformed as to the character of the conveyance.

It is obvious that the controlling fact necessary to support the conclusion that the contract be, as reformed, canceled, is the one to the effect that, if it should turn out that the plaintiff could not convey full and perfect title to the land, the money deposited should be returned and the contract canceled, and that the provision inserted in the written contract that, in such case, it should be only canceled at the election of the defendants, was inserted by inadvertence and mutual mistake. The mistake as to the form of the conveyance would not justify the cancellation of the contract, but simply a reformation as to the character of the conveyance to be given. Nor could the plaintiff have a reformation and cancellation of the contract on the ground that the defendants had not performed the terms of the contract.

If, however, the other finding, as to the cancellation of the contract in case the plaintiff was unable to pass a good and perfect title to the land, is sustained by the evidence, then the conclusion of law follows

that the written contract should be reformed, and, as reformed, cancel-
ed; because it is admitted by the pleadings that the plaintiff was and
is unable to convey such title, and the defendants by reason thereof
seek in this action a performance of the contract pro tanto and a deduc-
tion of $7,500 as damages from the total amount of the purchase price.
It is clear that, if the contract was to be canceled in the event that
the plaintiff could not convey good title, the right to have such cancel-
lation does not depend upon the election of the defendants. They are
not entitled to a partial performance and damages as claimed, for,
if the contract was as the plaintiff contends, the parties stipulated just
what the remedy should be in case the plaintiff could not convey good
title, and such remedy is the exclusive one, and either party is entitled
to invoke it against any attempt of the other to enforce the contract.
Schwab v. Baremore, 95 Minn. 295, 104 N. W. 10.

The pivotal question is, then, whether the finding is sustained by the
evidence. There is nothing unusual or unreasonable in the contract as
claimed by the plaintiff, although it may be somewhat illogical. Similar
contracts have been before this court for construction. See Schwab
v. Baremore, supra, and Mackey v. Ames, 31 Minn. 103, 16 N. W. 541.

The plaintiff, as a witness on his own behalf, gave testimony which
directly and clearly tended to establish the actual contract as he claimed
it to be, and that the words of limitation referred to were inserted in
the written contract by inadvertence and mutual mistake of the parties.
There was other evidence tending to corroborate him. On the other
hand, there was evidence on the part of the defendants tending to the
contrary. One of the defendants, however, who was present when the
contract was reduced to writing, testified on his cross-examination as
follows:

> Q. Did you understand that that contract was to be so drawn
> that you alone had the election to cancel it, or to make Lockwood
> give a good title, whether the title was good or not? A. No,
> sir. Q. Didn't you understand that Lockwood had the same
> rights under that contract as you had? (Objected to as ir-
> relevant. Sustained.)

This is quite significant. If there was any misunderstanding of the
question or of the answer of the witness, the second question afforded

an opportunity for the witness to explain and correct the matter, and yet on the defendants' objection an answer to the question was excluded. It will serve no practical purpose further to refer to or discuss the evidence. We have attentively considered the whole record and have reached the conclusion that the finding is sustained by clear and satisfactory evidence.

It follows that the order of this court heretofore made reversing the order of the trial court and granting a new trial must be vacated and the order appealed from affirmed. So ordered.

JAGGARD, J. (dissenting).

I dissent. Without doubt the only question in the appeal was whether the plaintiff's testimony made out a case of mutual mistake. I think it did not.

That testimony showed two things clearly. In the first place, it showed that plaintiff intended to convey some title to the land, and that such title was the interest of a husband, whose wife was living, but insane, in lands, the title to which stood in his name. His own testimony, the agreement he executed, his subsequent dealings with the property, as by way of lease to the defendant, and the admissions of his counsel's briefs, and all the circumstances of the case, to my mind demonstrated this.

It is the settled rule of this state that if a contract to sell land says nothing whatever about the title, if it be simply an agreement to sell on the part of a first party and on the part of the second party to buy the premises in question, that contract will bind the first party to make a good title. In every contract for the sale of land, unless the contrary intention is expressed, there is an implied undertaking on the part of the vendor, while the contract remains executory, to make out a good title, clear of all defects and incumbrances. Drake v. Barton, 18 Minn. 414, 418 (462). And see Cogan v. Cook, 22 Minn. 137; Murphin v. Scovell, 41 Minn. 265, 43 N. W. 1. This rule is generally enforced. See Herrod v. Blackburn, 56 Pa. St. 103, 94 Am. Dec. 49; Burwell v. Jackson, 9 N. Y. 535.

There is a manifest difference between a contract to sell land and a contract to sell merely the vendor's interest in land. If it clearly appears from an executory contract for the sale of real property, taken

in connection with the allegations found in a pleading, the sufficiency of which is in issue, that the parties contemplated and bargained for nothing more than a conveyance which would pass such rights and interests as the vendor might have or that they had in view, and contracted for the mere transfer of the title held by the vendor, whether defective or not, that is all a vendee can claim or insist upon. McManus v. Blackmarr, 47 Minn. 331, 50 N. W. 230. And see Brame v. Towne, 56 Minn. 126, 57 N. W. 454.

In the case at bar the contract was to convey, not the interest in the premises which the defendant might have, but the land itself. By its terms the deposit made by the vendee was to remain in escrow, until, in the language of the court's findings, he should be able to convey full and perfect title. Accordingly, it seems clear that the plaintiff as a vendor agreed to convey the title he supposed he had, but did not in fact have, to the defendant as the vendee.

In the second place, plaintiff's case tended to show that in the negotiations of the parties, but not in the contract, he refused to guaranty the title. The result was an inconsistent position on his part. He disclaimed one of the obligations of the agreement which he testified he made and which was incorporated into the written contract. In other words, he was honest, but confused. His testimony does not seem to me to be of that consistent, clear, and convincing character which it is elementary equity requires as a condition precedent to setting aside the solemn written obligations of the parties.

To my mind nothing is added to the plaintiff's case by the testimony of the defendant, which is quoted in the majority opinion. That question was double. It resulted in two inquiries, namely: (1) "Did you understand that that contract was to be so drawn that you alone had the election to cancel it?" And (2) "Did you understand that that contract was to be so drawn to make Lockwood give a good title whether the title was good or not?" If he answered "No, sir" to the first part of the question, then this part of the record tends to sustain plaintiff's contention. If he answered "No" to the second question, then the reply was obviously proper, and proved nothing. The objection to the other question quoted in the majority opinion, namely, "Didn't you understand that Lockwood had the same rights under that contract as

you had"—was properly sustained.  The contract spoke for itself.  The defendant had previously quite fully contradicted plaintiff's version of the alleged mistake.