### GRAY v. SMITH et al.

(Circuit Court, N. D. California. August 10, 1896.)

No. 11,878.

1. VENDOR AND VENDEE—EXECUTORY CONTRACT.
   It is not necessary to a valid executory contract for the sale of lands that the vendor shall be absolute owner thereof when he makes the con-

tract. It is sufficient if he has an enforceable contract for the purchase thereof, or stands in such relation to it that he can carry his contract of sale into effect at the time specified. Easton v. Montgomery, 27 Pac. 280, 90 Cal. 307, followed.

2. JUDGMENT—QUIETING TITLE—BARRING CONTINGENT ESTATE.
Lands were devised to testator's married daughter for her natural life, and after her decease "to her children or the survivor or survivors of them." The testator's wife disclaimed under the will, and sued to quiet title, making all persons interested parties defendant, including the daughter and her husband and their children then born. Judgment was given for the plaintiff. *Held,* that this judgment barred the right of after-born children.

3. STATUTE OF FRAUDS—SUFFICIENCY OF MEMORANDUM—IDENTIFICATION OF LANDS.
A contract for the sale of land is sufficient to satisfy the statute of frauds if, when all the circumstances of position, ownership, situation of the parties, and their relation to each other and to the property, are disclosed as they were at the time the writing was made, the meaning and application of the writing are plain and certain.

4. SAME.
Where a contract in writing designated some of the lands to be conveyed as "land at Sites, consisting of 3,281 and ½ acres, at $5.00," and it appeared that the vendor had several tracts of land near Sites, *held* that, as the land to be sold was identified by quantity and value, and by a further statement that the vendor's agent would point it out to the vendee, this was a sufficient identification and description to satisfy the statute of frauds.

5. EXECUTORY CONTRACTS—DEPENDENT COVENANTS.
Where one had contracted to purchase a tract of land for $165,000 in cash, and thereafter contracted with a third party to sell the same for $125,000 in cash and certain other lands to be taken in part payment, *held* that, the covenants in the latter contract being dependent and concurrent, he could not maintain a suit against such third party for damages for breach of the contract where it appeared that he was not prepared at the time fixed for the consummation of the transaction to pay his vendor $165,000 in cash, but expected to raise the difference between said amount and the $125,000 in cash which he was to receive upon the credit of the lands so received in exchange.

Sidney V. Smith and Vincent Neale, for plaintiff.
S. C. Denson, J. J. De Haven, and Richard Bayne, for defendants.

McKENNA, Circuit Judge (orally). The opinion in this case is somewhat long, but probably not long enough, considering the importance of the case, and the ability with which it was presented. I do not recall any case since I have been on the bench which has been presented with the ability that this case has been on both sides.

This is an action for damages for the nonperformance of a contract for the purchase or exchange of lands. The contract is found in the following papers: "Plaintiff's Exhibit A" (offer):

"16 Sept., 1891.
"To Albert E. Gray, Esq., 405 California St., San Francisco—Dear Sir: Provided you take the following described property, situate in Tehama and Colusa counties, as part payment up to one hundred and fifteen thousand dollars ($115,000), I hereby make you an offer to purchase the lot situate on the south side of Market St., in this city, extending through to Stevenson St., lying on the east side of and adjoining Central Park, and running east therefrom eighty-two and one-half feet (82-½ feet) by a depth of one hundred

and sixty-five feet (165 feet), at the price of two hundred and forty thousand
dollars ($240,000), namely, in cash.................................. $125,000
And in land as above.......................................... 115,000

$240,000

"This offer to hold good for three weeks from this date, to enable you to
inspect my said lands.    Said lands described over page.
    "Yours, &c.,                                                Edgar Mills."

## The following appears on back of above letter:

"In Colusa County.

"My ranch near Colusa Junction, consisting of 2,400 acres, known as
    'Eureka Ranch,' at $20.00..................................... $ 48,000
"Land at Sites, consisting of 3,281½ acres, at $5.00.................. 16,400

"In Tehama County.

"My ranch known as 'Elhorn Ranch,' consisting of 1,060 acres, at 30.. 31,800
"Four hundred acres belonging to me, close adjoining Kirkwood,
    at 20 ..................................................... 8,000
"And 1,280 acres belonging to me, a few miles west of Kirkwood,
    at 15 .................................................... 19,000

$115,400

"Say 8,421 at $115,000.

"My agent, Mr. Houx, will show you the above lands, and give you sectional de-
scriptions.
    "Yours, &c.,                                                Edgar Mills."

## The next is "Exhibit B" (accepting Mills' offer):

"San Francisco, October 6th, 1891.

"Edgar Mills, Esq., Pacific Union Club, San Francisco—Dear Sir:  Refer-
ring to your letter to me of the 16th September, 1891, wherein you say:
'Provided you take the following described property, situate in Tehama and
Colusa counties, as part payment up to one hundred and fifteen thousand
dollars ($115,000), I hereby make you an offer to purchase the lot situate
on the south side of Market St., in this city, extending through to Steven'son
St., lying on the east side of and adjoining Central Park, and running east
therefrom eighty-two and one-half feet (82-½ feet) by a depth of one hundred
and sixty-five feet (165 feet), at the price of two hundred and forty thousand
dollars ($240,000), namely:
    In cash ....................................................$125,000
    And in land as above........................................ 115,000

$240,000

" 'This offer to hold good for three weeks from this date, to enable you to
inspect my said lands',—thereinafter described.  I now and hereby accept
your said offer in the said letter contained.
    "I am, most respectfully,                                   Albert E. Gray."

## The next is "Plaintiff's Exhibit C" (accepting modifications, and confirmation of same by Mills):

"San Francisco, Oct. 7th, 1891.

"Dear Sir:  I hereby accept the modification in the terms of your letter
to me of the 16th September, 1891, now made by you, namely, that you pay
in cash one hundred and twenty thousand dollars................... $120.000
And in land (as specified in your said letter)....................... 115,000

$235,000

    "Yours, respectfully,                                        Albert E. Gray."

"To Edgar Mills, Esq., Union Pacific Club, San Francisco:  I hereby confirm
the above, and direct you to forward abstract of title to me or my attorneys
herein.                                                          Edgar Mills."

The next is "Plaintiff's Exhibit W":

"San Francisco, Sept. 18th, 1891.

"Joseph A. Donohoe, Esq., San Francisco—Dear Sir: Regarding sale of your property 82½ by 165 feet between 7th and 8th streets, I hereby offer your firm $160,000 cash. I cannot wait for letter, and, as I stated to you to-day, must have answer by cable, as I have only a limited time and wish to reiterate what I said to you to-day, this is a good price for the property, simply because I can get you better property for less money. Please let me hear from you at your earliest convenience, and much oblige.

"Very truly, J. H. Cavanaugh."

Then follow the telegram and letters from Joseph A. Donohoe, Sr.:

"Cable Message.

"Western Union Telegraph Company.

"North Berwick, Oct. 7, 1891.

"Received at San Fran.

"Donohoe, San Fran.: Sell for wish winston web." [The translation of which is as follows: "Sell for $165,000."]

"9:58 a. m."

Indorsed: "Plffs.' Ex. X."

The next is "Plaintiff's Exhibit Y" (agreement addressed on envelope to Mr. J. H. Cavanaugh):

"San Francisco, Oct. 7th, 1891.

"Mr. J. H. Cavanaugh: I hereby agree to sell my lot 82⁶/₁₂ feet on south side of Market St. immediately east and adjoining the Central Park, between 7th and 8th Sts., and running through to Stevenson St. in the rear, to Edgar Mills, for one hundred and sixty-five thousand dollars U. S. gold coin ($165,000), payable on delivery of deed, after examination of title, say fifteen days from date. The purchaser to pay half of the taxes for the current year.

"Jos. A. Donohoe, Jr.,
"Per J. A. Donohoe, Jr."

Those signatures were explained afterwards to mean "Jos. A. Donohoe, Sr., by J. A. Donohoe, Jr."

The relations between Gray and Cavanaugh are exhibited by the following papers: "Plaintiff's Exhibit FF:"

"Sept. 4, 1891.

"To Albert E. Gray—Dear Sir: With reference to the Market St. property between 7th and 8th Sts., having a frontage of 87½ feet on Market extending through to Stevenson St. in the rear, which I have for sale, being at present the property of Joseph Donohoe, it is understood and agreed between us that we divide equally between us the commission payable on the sale thereof, or the net excess between the selling price and the price your customer (or buyer introduced through your efforts) may give in cash, or partly in cash and part in real-estate exchange. J. H. Cavanaugh.

"Albert E. Gray."

The next is "Plaintiff's Exhibit GG":

"San Francisco, Oct. 7th, 1891.

"To J. H. Cavanaugh—Dear Sir: With reference to my contract with Mr. Edgar Mills, wherein he agrees to purchase Mr. Donohoe's property on the south side of Market St., having a frontage of eighty-two and a half feet by one hundred and sixty-five feet between Seventh and Eighth streets, as appears in his letter of contract of the sixteenth of September last, I hereby acknowledge that you hold an equal interest with myself in said contract; the lands mentioned in said contract to be granted and conveyed to us as tenants in common; and I hereby authorize you to act for us both in your

negotiations with Mr. Donohoe. I have duly accepted Mr. Edgar Mills' letter of contract of the 16th ulto., as above.

"Yours, truly,                              Albert E. Gray.

"Approved:   J. H. Cavanaugh."

The next is "Plaintiff's Exhibit HII" (assignment and agreement):

"707-½ Larkin St., San Francisco, December 28, 1891.

"In consideration of the love and affection I bear my dear wife, Amelia, I hereby assign to her the contract between myself and Joseph A. Donohoe, dated October 7th, 1891, whereby he agrees to sell to my nominee, Mr. Edgar Mills, his lot, 82-6/12 feet, on south side of Market St., for $165,000 (a copy of which contract is hereunto annexed, marked 'A'), and all my right, title, interest, benefit, claim, and demand therein or thereunder; to hold unto my said wife, her heirs, executors, administrators, and assigns, absolutely and for her own sole use and benefit.                    J. H. Cavanaugh.

"Witnesses to the signing hereof by said J. H. Cavanaugh:

"Max Blum, 709 Larkin St.

"Joe A. Patterson, 707-½ Larkin St., San Francisco."

Then follows the contract between Cavanaugh and Donohoe:

"A.

"San Francisco, Oct. 7, 1891.

"I hereby agree to sell my lot, 82-6/12 feet, on south side of Market St., immediately east and adjoining the Central Park, between 7th and 8th Sts., and running through to Stevenson St. in the rear, to Edgar Mills, for one hundred and sixty-five thousand dollars U. S. gold coin ($165,000), payable on delivery of deed after examination of title, say fifteen days from date. The purchaser to pay half of the taxes for the current year.

"[Signed]                             Jos. A. Donohoe, Jr.,

"Per J. A. Donohoe, Jr.

'Addressed to Mr. J. H. Cavanaugh.

"The above is the copy of contract marked 'A,' referred to in annexed assignment of December 28, 1891.                  J. H. Cavanaugh.

"Witnesses:

"Max Blum.

"Jos. A. Patterson."

The next is "Plaintiff's Exhibit II" (assignment):

"I, Amelia Cavanaugh, formerly the wife and now the widow of J. H. Cavanaugh, deceased, formerly of San Francisco, do hereby, for value received, assign, transfer, and set over to Albert E. Gray, of Lasata ranch, near Oroville, all my interest, claim, and demand against the estate of Edgar Mills, deceased, for damages for breach of contract by said Edgar Mills, deceased, dated October 7th, 1891, for the purchase of the lot formerly owned by Joseph A. Donohoe, on Market street, near Central Park. In witness whereof I have hereunto set my hand and seal this 4 day of Sept., 1893.

"A. Cavanaugh. [Seal.]

"Signed, sealed, and delivered by the above-named Amelia Cavanaugh in the presence of J. Whiteside, Driver for Wilson's Stable, Raymond."

In addition to these documents there was evidence in explanation of them. Mr. Joseph Donohoe, Jr., testified that he only knew Mr. Cavanaugh when he came to make an offer for his Market street lot; that he made a verbal offer first, and made it good in writing afterwards; and produced and identified the letter of September 18, 1891. After receiving this, he wrote his father, and received the messages supra, and the following letter:

"San Francisco, Sept. 19, 1891.

"My Dear Father: I have a letter before me from J. H. Cavanaugh, real-estate broker, of 127 Montgomery street, opposite Occidental Hotel. He offers

$160,000 cash for the 82½ feet on the south side of Market street, which is about $1,930 per front foot. I suppose I could get him up to $2,000 per front foot, which is the price at which you sold the 60 feet. According to your letter of July 23rd, the property cost you * * *. Cable me yes or no regarding sale, but do not say, 'No; expecting to build—no, no, no.' It is not fair to vote three times.          J. A. Donohoe, Jr."

To this he received the following reply:

"Marine Hotel, North Berwick, Oct. 7, 1891.

"My Dear Son: Yours of the 19th ult. received. Note you are offered $160,000 for the 82½ feet on Market street, cash. I cabled you 'Sell for winston web,'—one hundred, fifty, and fifteen, equals $165,000. I think the intending buyer will take it. * * * Of course, if you sell, it should be net to me, and the buyer to pay pro rata of this year's taxes. Still, do what you think best.

"Yours,          Papa."

After receipt of the cipher telegram, supra, the witness reported to Cavanaugh, and the latter agreed to take the property. The witness was asked the following question: "Q. I will ask you, Mr. Donohoe, on whose behalf you were acting when you were signing that paper." And replied as follows: "A. My father's." There was further colloquy, from which it appeared that C. informed D. that G. was interested, and produced a writing to that effect; and that C. told, and also Mills told him the same on next day, that the latter was to pay for the property, part in cash and part in country lands. The witness sent abstract to Mills at Pacific Union Club, and afterwards Mills' attorney sent for witness, and in his presence said the title was defective. "Q. Do you know whether he told you that Mr. Mills would not buy the property on account of the defect?" A. That was the purport of his rejection. He would not pass the title." The witness further said Mr. Galpin perfected the title, he agreeing that it was defective; and subsequently the lot was sold. It took about 90 days to successfully clear the title.

The nonperformance of the contract is admitted, and is sought to be excused, or damages averted, on the following grounds: (1) That Gray was neither the legal nor equitable owner of the Market street lot, or in such relation with it as to enable him to claim performance of the contract from Mills, or sue for its breach by the latter. (2) Imperfection of title of the lands offered by plaintiff. (3) Deficiency in the memorandum of the bargain, inasmuch as lands not described with sufficient certainty to satisfy the requirements of the statute of frauds. (4) That the contract was abandoned by mutual consent. (5) That the plaintiff has failed to show that he had the ability to perform it.

1. The first contention is answered adversely to the defendant by the case of Easton v. Montgomery, 90 Cal. 307, 27 Pac. 282. Mr. Justice Harrison, speaking for the court, said:

"In every executory contract for the sale of land there is an implied condition that the title of the vendor is good, and that he will transfer to the vendee, by his deed of conveyance, a title unincumbered and without defect. Burwell v. Jackson, 9 N. Y. 535; Pomeroy v. Drury, 14 Barb. 418; Innes v. Willis, 48 N. Y. Super. Ct. 192; Dwight v. Cutler, 3 Mich. 566; Warv. Abst. 293."

The same justice, delivering the opinion of the court in Wilcox v. Lattin, 93 Cal. 594, 29 Pac. 226, repeated this language substantially. But in Easton v. Montgomery, it was likewise held that:

"It is not necessary, however, that the vendor should be the absolute owner of the property at the time he enters into the agreement of sale. An equitable estate in land, or a right to become the owner of the land, is as much the subject of sale as is the land itself; and whenever one is so situated with reference to a tract of land that he can acquire the title thereto, either by the voluntary act of the parties holding the title or by proceedings at law or in equity, he is in a position to make a valid agreement for the sale thereof. As was said by Mr. Justice Paterson in Burks v. Davies, 85 Cal. 114, 24 Pac. 613: 'If, though he be not the absolute owner, it is in his power, by the ordinary course of law or equity, to make himself such owner, he will be permitted within a reasonable time to do so.' If the agreement is made by him in good faith, and he has at the time such an interest in the land, or is so situated with reference thereto, that he can carry into 'effect the agreement on his part at the time when he has agreed so to do, it will be upheld. 1 Chit. Cont. (11th Am. Ed.) 431; Dressel v. Jordan, 104 Mass. 407; Townshend v. Goodfellow, 40 Minn. 312, 41 N. W. 1056; Smith v. Cansler, 83 Ky. 371; Gaither v. O'Doherty (Ky.) 12 S. W. 306; Tapp v. Nock (Ky.) Id. 713; Ley v. Huber, 3 Watts, 367; Tiernan v. Roland, 15 Pa. St. 429. We cannot lose sight of the proposition that in this country, where values of land fluctuate rapidly, and where transfers are so frequent, it is very common for the purchaser of land to make a transfer before he has acquired the title. It would work great injustice to hold that no one could make a valid contract for the sale of land until he has himself become clothed with the absolute title."

Cavanaugh was so situated in reference to the Market street lot as to convey the title to Mills through the Donohoes. Of course, we have seen that Cavanaugh and Gray were also in such relations to each other as to give them mutual interest.

2. The second proposition is, the title to the property which was to be sold to Mills is dependent upon a will executed by one William Martin. By the will the property was devised to his wife, Margaret, "for and during the term of her natural life, provided she shall remain unmarried." If she should marry, however, the property was then devised (to quote the will) "to our son, John Martin, and his heirs, one-half thereof, and to our daughter, Mary, now the wife of Thomas Penniman, for and during the term of her natural life, the other one-half, and after her decease to her children, or the survivor or survivors of them." A part of the Market street lot (the Donohoe lot) was attempted to be devised by this will, but Margaret Martin disclaimed under the will, and asserted title to the property as her own, and brought suit September 15, 1875, in the Nineteenth judicial district court of the city and county of San Francisco, against her son, John Martin, and Mary Penniman, and her husband, and all the living children of said Mary Penniman by a former husband and by Penniman, to quiet the title to said property,—in other words, all the children who were then born were made parties to that suit besides herself and husband. An answer was duly filed in the case, and such proceedings had that a judgment was rendered in favor of the plaintiff, the court finding that the allegations of her complaint were true. After the suit was brought, and the rendition of judgment, other children were born to said Mary Penniman, and it is

claimed that they are not estopped or bound by the judgment, not being parties thereto, and hence Donohoe's title is defective to the extent of their interest. At the reargument of the case I expressed a view contrary to defendant's contention, and Judge De Haven, one of the counsel for the defendants, conceded that the contention was not justified. The language of Martin's will was, as we have seen, "to our daughter, Mary, now the wife of Thomas Penniman, for and during the term of her natural life, the other one-half [by a previous clause one-half was left to their son, John, and this half is left to Mary], and after her decease to her children, or the survivor, or survivors, of them." Mary Penniman, as we have also seen, was made a party to the suit to quiet title. This was a virtual representation of after-born children. "In such case," the supreme court said, in Miller v. Railway Co., 132 U. S. 672, 10 Sup. Ct. 209, "it is sufficient to bind the estate in judicial proceedings to have before the court those in whom the present estate of inheritance is vested. Lord Redesdale's authority on this point is decisive. In Giffard v. Hort, 1 Schoales & L. 386, 408, he says: 'Where all the parties are brought before the court that can be brought before it, and the court acts on the property according to the rights that appear, without fraud, its decision must, of necessity, be final and conclusive. It has been repeatedly determined that, if there be tenant for life, remainder to his first son in tail, remainder over, and he is brought before the court before he has issue, the contingent remainder-men are barred.' In another part of the same opinion Lord Redesdale said: 'Courts of equity have determined on grounds of high expediency that it is sufficient to bring before the court the first tenant in tail in being, and, if there be no tenant in tail in being, the first person entitled to the inheritance, and, if no such person, then the tenant for life.'" The doctrine is sensible and practical, and does not make the settlement of rights await the happening of almost incalculable contingencies. See, also, Freem. Judgm. § 172; Story, Eq. Jur. § 656a; Story, Eq. Pl. 144, 145; Faulkner v. Davis, 98 Am. Dec. 718; Baylor v. Dejarnette, 13 Grat. 152; Miller v. Foster, 76 Tex. 485, 13 S. W. 529; Nodine v. Greenfield, 7 Paige, 544; Mead v. Mitchell, 17 N. Y. 212; Kent v. Church of St. Michael, 136 N. Y. 10, 32 N. E. 704; Kirk v. Kirk, 137 N. Y. 510, 33 N. E. 552.

3. The offer of Mills to Gray was as follows:

"16 Septr., 1891.

"To Albert E. Gray, Esq., 405 California St., San Francisco—Dear Sir: Provided you take the following described property, situate in Tehama and Colusa counties, as part payment up to one hundred and fifteen thousand dollars ($115,000), I hereby make you an offer to purchase the lot situate on the south side of Market St., in this city, extending through to Stevenson St., lying on the east side of and adjoining Central Park, and running east therefrom eighty-two and one-half feet (82-½ feet) by a depth of one hundred and sixty-five feet (165 feet), at the price of two hundred and forty thousand dollars ($240,000), namely, in cash.................................. $125,000
And in land, as above.......................................... 115,000
                                                                _____
                                                                $240,000

"This offer to hold good for three weeks from this date, to enable you to inspect my said lands. Said lands described over page.

"Yours, &c.,                                          Edgar Mills."

Endorsed:

"In Colusa county, my ranch near Colusa Junction, consisting of
2,400 acres, known as 'Eureka Ranch,' at $20.00 .................. $ 48,000
"Land at Sites, consisting of 3,281½ acres, at $5 .................... 16,400
"In Tehama county, my ranch known as 'Elhorn Ranch,' consisting
of 1,060 acres, at 30 ......................................... 31,800
"Four hundred acres belonging to me, close adjoining Kirkwood, and
1,280 acres belonging to me, a few miles west of Kirkwood, at 20
and 15 ....................................................... 19,200
                                                              _____
                                                              $115,400

"Say 8,421 at $115,000.

"My agent Mr. Houx will show you the above lands and give you sectional
descriptions.

"Yours, &c.,                                    Edgar Mills."

The description "Land at Sites" is claimed to be insufficient for
identification, and hence it is contended that the third objection of
defendants is established.    The principle by which the sufficiency of
a memorandum of agreement to sell real estate is tested there is no
dispute about, and it has been clearly and fully expressed in Mead v.
Parker, 115 Mass. 413, and quoted and approved in Towle v. Coal Co.,
99 Cal. 397, 33 Pac. 1127:

"When all the circumstances of position, ownership, situation of the parties,
and of their relation to each other and to the property as they were when the
negotiations took place and the writing was made, are disclosed, if the mean-
ing and application of the writing, read in the light of those circumstances, are
certain and plain, the parties will be bound by it as a sufficient written con-
tract or memorandum of their agreement. That parol evidence is competent
to furnish these means of interpreting and applying written agreements, is
settled by the uniform current of authorities."

Applying this principle to the facts of the case at bar, it must be
said that the memorandum does no more than escape defect.    In
Marriner v. Dennison, 78 Cal. 202, 20 Pac. 386, the supreme court of
California held that the extrinsic fact which would apply to a com-
plete description of a specific tract must be alleged in the complaint.
Responding to this authority, the complaint in the case at bar al-
leges "that on said 7th day of October, 1891, the said Edgar Mills
did own the above lastly-described lands, and did not own any other
lands at Sites, aforesaid."    The evidence, however, shows that Mills
did own other lands near Sites, and there is great force in the con-
tention that this fact makes too doubtful the identity of the land re-
ferred to.    In the case in which the principle supra was announced,
the memorandum was as follows:

"Boston, Dec. 17, 1892.

"This is to certify that I, Jonas Parker, have sold to Franklin Mead the
house on Church St., for the sum," etc.

The declaration alleged that the house referred to was on Church
street, Summerville.    The court said:

"We think the writing is sufficient to satisfy the statute of fraud; and if,
when the facts were shown, the ambiguity disappeared, it was capable of
being enforced as a contract."

In this case, the parol evidence contradicted the first impression
of the memorandum, that the house and lot was in Boston, and fixed
its locality at Summerville,—as great an indulgence to parol testi-

mony as the case at bar calls for. While Mills had several tracts near Sites, the land intended is identified by quantity and value; and, besides, the statement that his agent would point it out is of no inconsiderable consequence. But I concede the point is a close one, and I am not as confident as I should like to be that I am right in holding the memorandum sufficient.

4. That the actions of the parties show a mutual abandonment of the contract is urged upon the written negotiations and certain oral testimony. The documentary evidence has already been given. The oral testimony is too long to quote. It is enough to say that it shows an abandonment by Donohoe. But Mills' obligation was to Gray, and the evidence certainly leaves an important matter in very dangerous ambiguity, and this without inferring anything from the silence which the statute imposes upon the living party to a transaction in litigation with the estate of the deceased one. But ambiguous testimony may have more than one explanation, and certainly the burden of proof on this issue is not on the plaintiff. We may accept, therefore, as determinative in favor of plaintiff, the fact of the assignment of the contract by Cavanaugh to his wife, which was written by Gray, as evidence that they had not acquiesced in a release of Mills.

5. The covenants between Gray and Mills were mutual and dependent, and hence defendants urge that Gray must show not only a willingness to perform, but an ability to perform, as a condition of the recovery of damages, and have cited a number of cases illustrating the principle. The contract of Donohoe was to convey to Mills upon the payment of $165,000 and the taxes. The contract of Mills, however, was to pay $125,000 and certain lands. There was then $45,000, besides the taxes, to be paid by Gray (I omit Cavanaugh's name for convenience), and this money he expected to raise on the country lands conveyed to them by Mills. This makes Gray's ability to perform not independent of Mills' performance, as the principle would seem to require, but dependent on Mills' performance. Concurrent and dependent covenants are defined by Bouvier as follows:

"Concurrent covenants are those which are to be performed by the parties to each other at the same time. A dependent covenant is one which it is not the duty of the covenantor to perform until some other covenant contained in the same agreement has been performed by the opposite party. When covenants are dependent or concurrent, the covenantee is not entitled to recover for the breach of such a covenant until after he has performed the covenants on his part."

The application of these principles seems to be obvious. The obligations between Gray and Mills were mutual,—as binding on one as the other; they were dependent,—the performance by one being the consideration of the performance by the other; concurrent,—that is, the performance by each must be at the same time as that by the other. Could this be if the ability be not also concurrent, but may wait on either side the performance on the other? The doctrine of waiver does not apply. There may be a waiver of tender of performance,—of preparation of performance of the steps to make the ability immediately available. But efficient ability is back of, and is essential to, the obligations of the parties, and must actually exist:

in each independent of the other. Most of the adjudged cases turn on excuses for nontender of performance, or of nonpreparation, but there are some which depend on and clearly decide the principle I have expressed. See Eddy v. Davis, 116 N. Y. 247, 22 N. E. 362, and cases cited; Grandy v. McCleese, 2 Jones (N. C.) 142; Grandy v. Small, 5 Jones (N. C.) 55; Brown v. Davis, 138 Mass. 458; M'Gehee v. Hill, 4 Port. (Ala.) 170. The latter case was an action by a vendee for a breach of contract for the delivery of a large quantity of corn and fodder, and the court said:

"It is a well-settled rule of law that when a contract is dependent, as where one agrees to sell and deliver and the other agrees to pay on delivery, in an action for nondelivery it is necessary for the plaintiff to prove a readiness to pay on his part, whether the other party was ready at the place to deliver or not. * * * The instruction of the court, therefore, that if the party believed that the credit which the corn and fodder when delivered might give, together with the other means of the plaintiff, would have enabled him to raise the money so as to have been prepared to pay, that would be sufficient evidence of readinesss, was erroneous."

These cases are not opposed by Smith v. Lewis, 24 Conn. 624, or Southworth v. Smith, 7 Cush. 391. The instance in the latter was the failure to count money which was present at the proper place for payment. The court held that the defendant's absence excused it. A real ability existed. It required but a trifling physical act to make it available for the tender or the performance of the obligation to pay. In Smith v. Lewis, there was also a real and substantive ability to perform. To make it available for actual performance, certain preparations were necessary, and these preparations were held to have been excused under the circumstances of the case. There was a time and place agreed upon to perform the contract, where it was understood that certain preparations were to be made. It was held that the willful absence of one of the parties excused the want of these preparations. The court remarked, stating the principle, and summarizing the facts:

"But it is justly said that the proof must show that the plaintiff was 'ready and willing' to perform; and, the disposition and ability being proved, the only remaining objection relates to the degree of preparation. The plaintiff had not his money in his formal possession. He had not cleared his own estate from incumbrances, and had not prepared the title deeds of his property. All these preparations he had suspended in view of his arrangement to meet the defendant, at which he expected some facilities to be furnished by the defendant, not necessary, but convenient to himself; but all of which preparations he was able to complete, and would have completed, if the defendant had not, by his absence, under the peculiar circumstances of the case, induced him to desist."

The only resemblance of the case quoted to the case at bar is that facilities were to be furnished by the defendant. Here the resemblance stops. In the quoted case these facilities were convenient, not necessary. In the case at bar, for aught that appears, they were absolutely necessary. They alone could make the readiness. In the quoted case the plaintiff had provided for the money, and witnesses testified that it would have been ready. As to the $2,000, the party who was to furnish it said that he knew the plaintiff must have a title to the place before security could be given witness, but he

would have paid the money to plaintiff before the latter had received the deed, and relied on him afterwards. In the case at bar there is no ability—readiness—in plaintiff shown, of which it could be said that the facility which Mills' performance would have furnished Gray was "convenient, but not necessary." There is no testimony that Gray or Cavanaugh had either property or credit, or that they had ever been promised a loan on Mills' land. All the evidence on the subject comes from a witness by the name of Minto, who testified that he was a surveyor,—civil engineer,—and that he reported on land values for the Savings Union. After stating the value of the lands, the following question and answer were given, after some correction: "Q. By whose instructions or orders were you valuing those lands? A. The Savings Union." That an application had been made for a loan to that institution by Gray or Cavanaugh, we may assume; and also that it was so far entertained by the bank that it sent its surveyor to look at it. But whether its quality or value reported was satisfactory, there is no proof whatever. Therefore the case at bar does not satisfy the rule of Smith v. Lewis, even regarding it as a sound one. But the case has been criticised. The editors of Smith's Leading Cases, in a note to Cutter v. Powell (volume 2, p. 29), say of it:

"There is no doubt that the case as decided by the majority goes to the verge of law, and opens the door for experiments and tricks. * * * It is only by assuming as a certain fact that which the majority of the court did so assume, though, perhaps, on an insufficient finding, that the plaintiff could unquestionably have performed every item of his engagement, and would so have performed them, that the decision comes within safe prnciples."

The case, being an extreme one, should not be extended beyond its exact facts.

It follows that the last contention of defendants is correct, and there was not an ability to perform shown, which is a necessary condition of the recovery of damages.

Judgment will be entered for the defendants, or, rather, defendants will prepare findings, and submit them to the other side, and then judgment will be entered for the defendants.